Tomaz Mendes REGATOS,
Plaintiff–Appellee,

v.

NORTH FORK BANK and New Commercial Bank Of New York, Defendants–Appellants,

North Fork Bancorporation, Defendant.

Docket No. 03–9024.

United States Court of Appeals,
Second Circuit.

Argued: Nov. 4, 2004.

Questions Certified to the New
York Court of Appeals:
Jan. 27, 2005.

---

**494**

Eric J. Bressler, Wickham, Bressler, Gordon & Geasa, P.C., Melville, New York, for Defendants–Appellants.

Daniel Kobrinik, Lopez & Romero, P.C., New York, New York (Eduardo F. López, Luis Alfredo Romero, Vanessa M. Flores, on the brief), for Plaintiff–Appellee.

Before: WALKER, Chief Judge, FEINBERG and WESLEY, Circuit Judges.

WESLEY, Circuit Judge.

Regatos, a citizen and domiciliary of Brazil, sued the Commercial Bank of New York and its successor-in-interest, North Fork Bank, (together, "CBNY") for reimbursement of $600,000 (and interest thereon) that was removed without his authorization from his bank account with CBNY in two wire transfers in March and April of 2001. CBNY moved for summary judgment on the ground that Regatos failed to protest the transfers in a timely manner, as required by his account agreement. In a thoughtful opinion dealing with important matters of first impression under New York law, Judge Shira Scheindlin denied the motion. *See Regatos v. North Fork Bank*, 257 F.Supp.2d 632 (S.D.N.Y.2003). The case then went to trial, resulting in a jury verdict and judgment for Regatos.

Regatos signed an account agreement with CBNY in 1997.[1] The agreement included the following language:

> The Bank will, unless the depositor has authorized to the contrary, send to the depositor at his address of record not less frequently than quarterly, a statement of accounts accompanied, when applicable, by items paid in support of the debit entries on such statement. The depositor will exercise reasonable care and promptness in examining such statement and items to discover any irregularity including, but not limited to, any unauthorized signature or alteration and will notify the Bank promptly in writing of any such discovery, and in no event more than fifteen (15) calendar days subsequent to the time that such statement and items were first mailed or available to the depositor. In those situations in which the depositor has authorized the Bank to hold his correspondence, this section shall apply as if the depositor received such statement on the date shown on the statement.

257 F.Supp.2d at 635 (quoting account agreement). Regatos received account statements only on request. In 2001 Regatos requested and received statements *prior* to the two wire transfers at issue. Regatos did not request another statement until August 9, 2001—more than 15 days after the wire transfers in question—even though additional bank statements had become available in the interim. Immediately upon viewing his statement on August 9, Regatos informed CBNY that the two transfers at issue were unauthorized. On appeal, CBNY does not contest this point.

At trial, CBNY maintained that whether authorized or not, the transfers were effective, meaning that they were executed pur-

---

[1]. In her Opinion and Order on summary judgment, Judge Scheindlin described in detail the facts relevant to the case. *See* 257 F.Supp.2d at 635–37. As such, we decline to repeat these facts in full, instead describing only the most essential elements.

suant to a security procedure upon which Regatos and CBNY had agreed.[2] However, the jury found that CBNY failed to carry its burden of proving that it complied with the security procedure. Judge Scheindlin's resolution on summary judgment of the key legal issues presented, in combination with the jury's fact-finding, dictated judgment in favor of Regatos. CBNY now appeals the district court judgment.

## Discussion

This appeal presents two issues of first impression in the interpretation of New York Uniform Commercial Code Article 4–A. First, this case presents the important question of whether the one-year statute of repose created by U.C.C. section 4–A–505 can be varied by agreement of the parties. Second, this case raises the issue of whether U.C.C. Article 4–A's notice requirements can be satisfied—at least if the parties have so agreed—by constructive notice. Because each issue is a matter of first impression in New York and may be determinative of the appeal, we certify both to the New York Court of Appeals.

1. *New York U.C.C. Article 4–A in General*

Electronic funds transfers, including the two transfers at issue in this case, are governed by U.C.C. Article 4–A. *See* N.Y. U.C.C. § 4–A–102. Although CBNY attempts to argue that the transfers at issue

are *also* governed by "parallel" provisions in U.C.C. Article 4, the plain language of Article 4–A belies CBNY's argument. Section 4–A–102 specifically provides that "resort to principles of law or equity outside of Article 4–A is not appropriate to create rights, duties and liabilities inconsistent with those stated in this Article."

The applicable provisions of Article 4–A for this case are sections 4–A–202, 4–A–204, and 4–A–505. Section 4–A–204 is the core substantive provision governing a customer's right to a refund from its bank for unauthorized transfers of funds:

> (1) If a receiving bank[3] accepts a payment order issued in the name of its customer as sender which is (a) not authorized and not effective as the order of the customer under Section 4–A–202, ... the bank shall refund any payment of the payment order received from the customer.

*Id.* § 4–A–204(1). Thus, as required by section 4–A–204(1)(a), we look to section 4–A–202 to determine whether the payment orders were authorized or effective. As noted above, the bank has waived any contention that the payment orders were authorized; for our purposes they were not. The "effectiveness" of a payment order is defined by section 4–A–202, which provides that "a payment order ... is effective ... if (a) the security procedure is a commercially reasonable method of providing security against unauthorized

---

**2.** CBNY and Regatos agreed to a security procedure that required Regatos to fax a signed payment order to CBNY's Sao Paulo office, where CBNY employee Abadi would confirm the order with Regatos by telephone, countersign the order, and fax it to the New York office. In New York, the signature on the fax would be compared with Regatos' signature card on file, and if they matched, the payment order would then be executed.

**3.** A receiving bank is the "bank to which the sender's instruction is addressed." *Id.* § 4A–103(a)(4). "The 'sender' of a payment order is 'the person giving the instruction to the receiving bank.'" 3 James J. White & Robert S. Summers, Uniform Commercial Code § 22–1 (4th ed.1995) (quoting U.C.C. § 4–A–103(a)(5)). Here, CBNY is the receiving bank because it received a payment order from someone whom it believed to be Regatos, and thereby transferred funds out of Regatos' account.

payment orders, *and* (b) the bank proves that it accepted the payment order in good faith and in compliance with the security procedure ...." *Id.* § 4–A–202(2) (emphasis added). The jury in this case found that CBNY had failed to prove that it had executed the transfers "in compliance with the security procedure." *Id.*

Early on in the litigation, CBNY raised a complete defense to liability tied to the account agreement. The bank contended that the account agreement restricted the period in which Regatos could seek a refund to 15 days from the issuance of a bank statement that identified the suspicious payment order, regardless of whether Regatos actually received the statement. In light of the timing of Regatos' objection to the bank—on the same day as actual receipt of the bank statement but more than 15 days from the first bank statement identifying the transfers—the bank asserted that Regatos was too late to seek a refund. Although Judge Scheindlin recognized that this defense presented issues of first impression in New York law, she had no alternative but to decide these questions by resolving the summary judgment motion. Judge Scheindlin concluded that the statute prohibited a contractual shortening of the notice period and required actual notice to the customer of the improper transfer. Thus the bank had to refund to Regatos the principal lost in the transfers if the payment orders were not authorized or effective.[4] *See Regatos,* 257 F.Supp.2d at 647.

On appeal, the bank raises a number of issues, some of which need not be addressed at this time. The two points relevant to the certification equation are contained in the legal questions that Judge Scheindlin resolved in Regatos' favor when she denied summary judgment. *See generally Regatos,* 257 F.Supp.2d 632. The bank contends that even if the payments were not authorized or effective, its account agreement with Regatos successfully limited Regatos to a 15–day period in which to object to transfers from his account. The bank further contends that the 15–day period ran from the time that the first account statement reflecting an unauthorized transfer became *available* to Regatos, despite the fact that—in accordance with the Account Agreement's "hold mail" policy—Regatos did not *actually see* that account statement until months later, after Regatos specifically requested it.

### 2. *Varying Section 4–A–505's One-year Statute of Repose By Agreement*

As noted above, when a transfer is neither "authorized" (not contested here) nor "effective" (as the jury so found) under section 4–A–204(1), "the bank shall refund any payment of the payment order received from the customer...." N.Y. U.C.C. § 4–A–204(1). But the right to a refund is not without limitation. Section 4–A–505 provides that "[i]f ... the customer received notification reasonably identifying the [relevant payment] order, the customer is precluded from asserting that the bank is not entitled to retain the payment unless the customer notifies the bank of the customer's objection to the payment within one year after the notification was received by the customer." *Id.* The Official Comment to section 4–A–505 notes that this section "is in the nature of a statute of repose for objecting to debits made to the customer's account." *Id.* § 4–A–505.

The bank contends that this one-year limitation on refunds can be and was reduced by the Regatos account agreement

---

4. Regatos' entitlement to recovery of the interest lost on that principal is governed separately, in accordance with the law involved in our second certified question, *infra.*

to 15 days from the date the bank statement first identified the transfers in question. Thus, argues the bank, Regatos' demand was untimely—his claim barred by his repose. Regatos, not surprisingly, argues that regardless of whether the notice requirement entails actual or constructive notice of the transfers, the time limit cannot be varied by agreement at all.[5] In his view, the right to a refund and the conditions that govern its assertion define the "obligation of a receiving bank" under section 4–A–204(2) and thus may not be altered by the account agreement. The district court agreed with Regatos and refused to allow the parties to contractually shorten the statute of repose. Each position has some merit. On the one hand, section 4–A–505 does not explicitly bar variance by agreement, and section 4–A–501 indicates that "[e]xcept as otherwise provided in this Article, the rights and obligations of a party to a funds transfer may be varied by agreement of the affected party." *Id.* § 4–A–501(1).

On the other hand, the Official Comment to section 4–A–505 specifically discusses a bank's refund obligation and, in so doing, notes that "this obligation to refund payment cannot be varied by agreement." N.Y. U.C.C. § 4–A–505, Official Comment (citing § 4A–204). Further, section 4–A–204 draws an important distinction between a refund of the face value of the payment order and interest lost on the refundable amount. An account agreement can establish a notification period as a precondition for an interest refund as long as that period is "not manifestly unreasonable," *id.* § 1–204(1), or greater than 90 days. *Id.* § 4–A–204. However,

the statute further provides that "the obligation of a receiving bank to refund payment ... *may not* otherwise be varied by agreement." *Id.* § 4–A–204(2) (emphasis added). Thus the dispute seems to turn on whether the variance here asserted by CBNY is a variance of the bank's refund obligation, or merely a variance of the time by which the customer must assert that obligation.

If the one-year statute of repose in section 4–A–505 is categorized as part of the "right or obligation" of the parties to a refund, then section 4–A–204 controls: "the obligation of a receiving bank to refund payment ... may not otherwise be varied by agreement." *Id.* § 4–A–204(2). However, if the one-year statute of repose in section 4–A–505 is categorized as anything other than the "right or obligation" of the parties *to a refund,* one would think that section 4–A–501 would allow the parties to shrink the temporal window in which the sender can demand a refund.

In their oft-cited treatise, White and Summers address the conflict between sections 4–A–204 and 4–A–505. *See* 3 White & Summers, *supra,* at 22. They begin by comparing section 4–A–505, which says nothing about variation by agreement, with section 2–725, which provides a four year statute of limitations that can be reduced to not less than one year but cannot be increased.[6] If the legislature saw fit to permit contractually established time limits for lawsuits in sales contracts but set bounds on those variations, what are we to make of section 4–A–505 with no statement in that regard whatsoever?

**5.** If this is the case, the one-year period provided by section 4–A–505 ensures Regatos' entitlement to recovery of his lost principal.

**6.** "An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it." U.C.C. § 2–725(1).

White and Summers seem to conclude that since the drafters of the U.C.C. were so specific as to disallow any variation of the substantive obligation to refund under section 4–A–204, they could not have intended to allow that obligation to be eviscerated by, say, a one-day statute of repose agreed on by the parties. *See* 3 White and Summers, *supra*, at § 22–4 ("[w]e are sure that a one day period would fail; where the line should be drawn we are not sure, but we are skeptical of [allowing a] 60–day [period]...."). But unlike section 2–725, which establishes a one-year minimum to prevent unreasonable compression of the statute of limitations, section 4–A–505 provides no minimum. Thus White and Summers conclude that "[s]ection 4–A–505 should not be interpreted to allow what cannot be done by agreement under 4–A–204." 3 White & Summers, *supra*, at § 22–4.

▮ While we might find this analysis determinative, we have regularly deferred to the views of New York's highest court in areas of first impression in New York law. Principles of federalism and comity require it; a vibrant and effective certification process ensures it. We have long noted that:

> the certification procedure is a valuable device for securing prompt and authoritative resolution of unsettled questions of state law, especially those that seem likely to recur and to have significance beyond the interests of the parties in a particular lawsuit.

*Kidney v. Kolmar Labs., Inc.*, 808 F.2d 955, 957 (2d Cir.1987). In our view, this case presents an appropriate opportunity for certification of an unsettled and significant issue of state law that will control the outcome of this case and will undoubtedly recur.2d Cir. R. § 0.27. As such, we now certify to the New York Court of Appeals the following question:

> **Can the one-year statute of repose established by New York U.C.C. Article 4–A–505 be varied by agreement? If so, are there any minimum limits on the variation thereof (such as "reasonable time") that estop CBNY from denying Regatos recovery in this case?** [7]

If the New York court answers either the first prong of this question in the negative or the second prong in the affirmative, then Regatos will be entitled to recover his lost principal absent other contentions raised by CBNY not noted here. If the New York court answers the first prong in the affirmative and the second prong in the negative, then Regatos' ability to recover his lost principal will depend on the resolution of the second certified question put forth in this opinion, *infra.* Regatos' ability to recover interest on his lost principal likewise depends on the New York court's resolution of the second certified question.

### 3. *Satisfying Notice Requirements with Constructive Notice*

As noted, the one-year period to object to an unauthorized transfer is measured from the time that "the notification was received by the customer." N.Y. U.C.C. § 4–A–505. The notification will only trigger the start of the one-year period if it "reasonably identif[ies] the [payment] or-

---

**7.** Two examples of situations in which such limits might estop CBNY are as follows. First, the 15–day period established by the account agreement could be below the minimum limits announced by the New York court in response to this certified question.

Second, the four-to-five-month periods intervening between availability of the account statements and Regatos' objection to the transfers could be below those minimum limits.

der" at issue. *Id.* Not surprisingly, the bank and Regatos disagree about whether the start of that period—be it one year or as otherwise agreed by the parties—is triggered by the customer's receipt of actual or constructive notice of the transfer.[8]

CBNY presses for constructive notice, arguing that "[w]hile receipt is not defined, there is no basis for concluding that constructive receipt through the hold mail system was not permitted." Yet neither is there any particular basis for concluding that constructive notice is permitted. While section 4–A–505 refers to notification that "reasonably identif[ies] the [payment] order" at issue, that does not mandate how notice is given—it only requires that the notice, be it constructive or actual, identify the payment order at issue.

The district court determined that the statute required actual notice. *Regatos,* 257 F.Supp.2d at 645. It reasoned that while Article 4–A was explicitly written to stand alone, the court—much like White and Summers in their analysis of section 4–A–505—was not prevented from comparing the language of Article 4–A with the language of other articles of the U.C.C. in the course of interpreting Article 4–A. The court looked to section 4–406 and noted that under that section, a bank is specifically authorized to hold the bank statement at the customer's request, while a similar provision is not contained in section 4–A–204. The court noted the obvious contrast to the language of Article 4–A, which requires that "the customer received notification." *Id.* § 4–A–505, § 4A–204; *see Regatos,* 257 F.Supp.2d at 645. Judge Scheindlin concluded that as the drafters explicitly chose to allow that alternative in

section 4–406 but failed to provide it in Article 4–A, constructive notice is not allowed in Article 4–A.

Yet the issue is not clear, especially when compounded by the potential for variation by agreement. As such, we now certify a second question to the New York Court of Appeals:

**In the absence of agreement, does New York U.C.C. Article 4–A require actual notice, rather than merely constructive notice? If so, can this requirement be altered by agreement of the parties and was such achieved here?**

If the answer to the first prong of this second certified question is in the affirmative and the answer to the second prong in the negative, then—regardless of the answer to our first certified question—Regatos is entitled to recover both principal and interest lost thereon, because he notified the bank of his objection to the transfers the same day that he received actual notice. If the answers to this second certified question are other than as just postulated, Regatos may be able to recover his lost principal, but will not be able to recover interest lost thereon, because more than 90 days passed between Regatos' receipt of constructive notice and his objection to the transfers. *See id.* § 4A–204(1).

As is always the case, the New York Court of Appeals is free to answer either question or both, as it sees fit, to resolve the open issues of New York law. *See Carvel Corp. v. Noonan,* 350 F.3d 6, 27 (2d Cir.2003). Certainly if New York law requires actual notice and does not allow contractual modification of the actual notice requirement, little more need be said

---

8. This issue applies not only to Regatos' entitlement to the lost principal, but also to the interest on the lost principal because section 4–A–204's separate treatment of interest recovery requires the customer "to notify the

bank of the relevant facts within a reasonable time not exceeding ninety days after the date the customer *received notification* from the bank." *Id.* § 4–A–204 (emphasis added).

to resolve the matter at hand. Our colleagues in Albany are free to reframe the questions and resolve them as they have done so ably and so often in the past.

## Conclusion

For the reasons stated, we certify the above questions to the New York State Court of Appeals. Upon receipt of the New York court's answer to the above questions, we will resolve the remaining issues as needed.